## JAMES W. KETCHAM

*v.*

## SARAH OWEN et al.

1. In an action for specific performance of a contract for the sale of land, it appeared that the vendor was a widow over seventy years old; that the contract was made, when complainant was not present, at the office of S., who had been a neighbor for thirty-five years, had done business for her husband and had advised her after the husband's death; that she was influenced by the advice of S., who acted for complainant, to sell for $2,375; that S. had previously tried to buy the land, but was not willing to pay $3,000, the price she asked; and that afterwards, but before the contract was made, she wrote him offering to take $2,500.—*Held,* that the defence that the agreement was unfairly obtained by S., by false representations made to the vendor to induce her to make it, was not sustained.

2. Specific performance of a contract for the sale of land for $2,375, which was worth $3,000, will not be refused on the ground of inadequacy of price.

3. Where a vendor of land, in April, 1890, informed her vendee that she would not perform the contract, delay in bringing suit for specific performance until August, 1893, was such laches as barred the action, especially as the contract was signed only by the vendor.

Ketcham *v.* Owen.

On bill for specific performance. Heard on bill, amended bill, answers, replication and proofs.

*Mr. James C. Youngblood* and *Mr. George T. Werts*, for the complainant.

*Mr. John B. Vreeland* and *Mr. Theodore Little*, for the defendants.

EMERY, V. C.

This is a suit for specific performance of a contract to convey land, brought by the purchaser against the vendor under the following state of facts: Henry Owen, the husband of the defendant Sarah Owen, died seized of the property in question, and, by the third item of his will, devised the property, a farm of seventy-six acres, in Morris county (along with the remainder of his property), to his wife, for her use and support during her life, to be used by her as she deemed most advisable, and after her death all the estate devised to her for her use during her life, which should then remain unexpended by her for her use and support, was to be divided equally between his son and three daughters. The testator appointed his wife the sole executrix of his will,

"empowering her, if she sees fit, to sell all my real estate of which I may be possessed at my decease (excepting the farm in Ohio), devised to my son Bartley, and to give a good and sufficient title therefor, and to use the proceeds thereof in manner and for the purpose set forth in Item Third."

Mrs. Owen proved the will in September, 1885, and on August 30th, 1889, executed the following agreement:

"NEW YORK, Aug. 30th, '89.

"Mrs. Sarah Owen, of Newark, N. J., has sold her farm of 76 acres, at Morris Plains, adjoining Mr. Sire's farm, to Mr. James W. Ketcham, of New York city, for $2,375—$2,000 mortgage back at 6 per cent. and $375 in cash. Deed to be given a few days before the first of April, 1890, at the office of Albert Sire, 99 Nassau St. Mr. Ketcham to pay tax on farm, mortgage to be made for three years.

"Received twenty-five dollars.                    MRS. SARAH OWEN."

The agreement was executed at the office of Mr. Benjamin Sire, a real estate dealer in New York, and at that time $25 was paid to Mrs. Owen on behalf of Mr. Ketcham. At the time of signing this agreement, Mr. Ketcham was not present, but an agreement in precisely the same terms, and signed with his name, was delivered to Mrs. Owen by Mr. Sire. During the fall of 1889, Bartley Owen, the son, and Mr. Williams, a son-in-law of testator, who did not know of the agreement for sale until after it was made, applied to Mr. Ketcham to give up the proposed sale, and offered to return the $25 paid, but he declined. The parties differ as to the reasons given. Shortly before April, 1890, when the deed was to be delivered, complainant, with his counsel, Mr. Dupignac, of New York, applied to Mrs. Owen, at her then residence in Newark, to deliver the deed and accept the mortgage, tendering the same for execution and offering to pay the balance of the cash purchase price. Mrs. Owen said she wouldn't have anything to do with it; that she had reconsidered the matter and didn't want to sell the property, and had left it in the hands of her lawyers. After this notification from Mrs. Owen that she would not carry out the contract, no further application was made to her by complainant, and no proceedings against her on the contract were taken until the filing of the bill in this case on August 4th, 1893. The bill was subsequently amended on August 13th, 1895, and further amended in March, 1896. The defendants, who are the widow and heirs-at-law of the testator, resist specific performance upon several grounds, three of which will be considered.

*First.* Because the agreement was unfairly obtained from the defendant Mrs. Owen by Benjamin Sire, who was the only person known to her in the negotiations, and who made false representations to her in order to induce her to make the agreement.

*Second.* Because the price is inadequate, the property being worth at least $5,000, and the enforcement of the agreement would be inequitable.

*Third.* Because of complainant's laches in filing his bill.

As to the first ground, the allegation of the answer is that

Mrs. Owen, who was over seventy years of age, and for years had been a neighbor of Mr. Sire's, was induced by Sire to visit his office on other business, and that on doing so, with no intention of selling the farm, Sire advised and persuaded her to sell it for the price fixed, representing to her, among other things, that the tenant then on the place was going to leave, and that on his representations and persuasions she signed the agreement, not knowing the value of the premises. The evidence, both of Mr. Sire and Mrs. Owen, shows that Mrs. Owen was influenced by the advice of Sire, who had been a neighbor for thirty-five years, had done business for Owen when he was living, and advised his widow after his death. But Mrs. Owen herself, while swearing that she yielded to Sire's persuasion to sign the contract, says that nothing was said to her about the tenant's leaving. Sire says the same thing, and although Mrs. Vincent, a daughter who was with Mrs. Owen at the time, says that Mr. Sire advised her mother to sell while she had a chance, because he understood Mr. Call, the tenant, was to leave in the spring, yet in view of the evidence of Mrs. Owen now given, it is clear, I think, that this statement, even if made, cannot be considered as having influenced her in making the contract. The other charges that the sale was broached upon a visit to Sire's office, induced for another purpose, and that Mrs. Owen had no idea of the value of the property, is also shown to be unfounded by a letter written to Mr. Sire by Mrs. Owen a week before, on August 22d, 1889, in which she says that after considering the matter she is willing to sell for $2,500 as the lowest price, and authorizes him to offer it for that. This letter was written at Newark and by Mrs. Vincent, with whom Mrs. Owen was then living, and was written at Mrs. Owen's request, who signed the letter after it was read over to her. Mrs. Owen had forgotten all about this letter, for I see no reason to doubt her honesty. Previous to this time Sire had, as she said, tried to buy the farm, which adjoined his property, but he was not willing to give her the price she asked—$3,000. There was discussion between Mr. Sire and Mrs. Owen about the price, after she reached his office on August 30th, in reply to a message requesting her to

come over, and Sire, who was certainly acting for Ketcham, and, as he himself now swears, was acting for both, advised Mrs. Owen to sell. It was probably due to Mr. Sire's advice that she yielded from the lowest price fixed by the letter—$2,500. But the charge of the answer that the agreement was procured by false representation on the part of Sire, is not sustained.

Secondly, as to the inadequacy of price, the evidence for complainant and defendant shows a wide discrepancy in value, the defendant's witnesses (other than the parties) fixing the value at $4,500 to $6,000. The complainant's witnesses generally fix the value at $2,500 to $3,500, two witnesses also placing it below $2,000, at which figure Sire fixes the value.

The reason of the rather wide difference is plainly by reason of the value being to a certain extent speculative. The property is located about three-quarters of a mile from Morris Plains, adjoining, or in the neighborhood, of places occupied for country residences, and desirable for that purpose. As farming land it is not specially valuable, except a portion of it perhaps for small truck-farming, and the buildings on it are not in good condition. The farm rents for $125 a year, the owner paying the taxes. The value of the place is therefore quite of a speculative character, but taking all of the evidence, it seems to me that an owner not forced to sell and in a situation to hold for its fair value, $3,000 is as low a price as a court could consider to be a fair and adequate price. Sire says that $3,000 was the price which Owen fixed in his lifetime. Mrs. Owen's valuation of $2,500 in her letter I do not place much reliance on as an estimate of value, for the reason that, in her situation, she was under strong personal inducements to yield on the point of value in order to have control of the fund for her support. She says that of the $125 rent she paid one-half for taxes, and that she was ready to sell for $2,500, when the others thought it too low. At Sire's office, on August 30th, she yielded $125 further on the price and consented to take $2,375, although she had previously fixed $2,500. Taking the fair valuation at the price I have fixed, the inadequacy is not great, and if Mrs. Owen was dealing only with her own property, and not acting as trustee, it would not be

sufficient to bar performance, nor would it even now probably be sufficient, standing alone, to be a bar to the relief, but it is, under the circumstances of this suit, a fact to be considered in connection with others on the right of the complainant to call upon the court to require the trustee to convey at this late day.

The laches of complainant, the remaining ground, is the main reason why relief must be refused, for while it is settled that time of performance is not generally of the essence of the contract, it is also settled that time may become essential by the express contract of the parties, and also may be made essential by the action of the parties after the contract. *3 Pom. Eq. Jur.* § *1408*, and cases cited. One of the recognized methods by which time may become essential by action of the parties after the contract, is by one party giving notice to the other to complete performance within a reasonable time. *3 Pom. Eq. Jur.* § *1408; Pom. Spec. Perf.* § *395* &c. Another, action of one party to the contract which will make time essential is a plain and direct notice to the other that he does not intend to perform the contract. *Pom. Spec. Perf.* § *412*. The general rule as to application to a court of equity for specific performance is that the complainant must show himself "ready, desirous, prompt and eager," the language which has been constantly repeated in the decisions from the time of its first use in 1801 by Lord Alvanley, M. R., in *Milward* v. *Earl Thanet, 5 Ves. 720, note ;* and where one party, arbitrarily or otherwise, notifies the other that he will not perform the contract, the bill, as the cases say, must be filed "speedily," unless, indeed, the party to whom notice is given be in possession under the contract, in which case the continuance of possession will be considered as a continual assertion of right under the contract and exclude the notion of acquiescence in the abandonment. *Pom. Spec. Perf.* § *412*, and cases cited.

In *Southcomb* v. *Bishop of Exeter, 6 Hare \*213,* the purchaser had given notice in January, 1842, that he rescinded the contract; a bill filed August 30th, 1843, was held to be too late. Vice-Chancellor Wigram says (at *p. 218*): "Whatever the leaning of the court in earlier times may have been, the tendency

of the modern cases has been to hold parties seeking the assistance of the court on bills for specific performance to the rule of equity which requires them to be prompt in asking such assistance." In *Eads* v. *Williams, 4 De G., M. & G. 674,* Lord-Chancellor Cranworth said (at *p. 691*) that where the purchaser repudiated the contract and quitted possession, a delay of three and a half years by the vendor in filing the bill was fatal. And in the English courts, a year seems to have been fixed as the limit of time for filing a bill, where one party has repudiated a contract admittedly made, and acquiescence for this period in the rescission is fatal to the remedy of specific performance. *Watson* v. *Reid, 1 Russ. & M. 236.*

The same rule was laid down in *McDermid* v. *McGregor, 21 Minn. 111,* and it was held that where one of the parties to a contract notifies the other that he will not perform it, acquiescence in this by the other party (not being in possession) by a comparatively brief delay in enforcing his right by suit, will bar an action for specific performance. The plain ground for requiring the bill to be filed speedily in such cases is that, on the refusal to perform by one party to the contract, the other party has on his part the right either to accept this refusal, as ground for withdrawal on his own part, or to insist on the existence of the contract by filing his bill to enforce. And his failure to take any action looking to the enforcement of the contract as existing may fairly be taken as evidence that he intends to acquiesce in the abandonment of the contract, and is no longer bound thereby on his part, and stands on his remedy at law for a breach of the contract. So long as he does not take such action to enforce this contract as existing, he is, in fact, exercising his option to consider the contract abandoned, and acquiescence for any considerable time in the notice of abandonment should be sufficient of itself to amount to an acceptance of the rescission and to put him to his remedy at law for a breach of the contract. *Parkin* v. *Thorold, 16 Beav. 59, 73.* Without undertaking to fix so short a limit in the present case as is fixed by the cases above referred to, or to say that any special limit should be fixed, it seems to me that the delay from April,

Ketcham *v.* Owen.

1890, when the notice was given, to August, 1893, is a bar to relief in this case. The complainant puts the delay upon Mr. Dupignac, his counsel in New York, who was directed, as he says, to proceed at once with the suit to get the property, and that complainant did not find out until the early part of 1891 that he had not done so. In the latter part of 1891 he employed counsel in New Jersey, who could not proceed until the papers (including the agreement) were procured from Dupignac; and these, complainant says, because of Dupignac's absence in the South and subsequent death, were not procured until the early part of 1893, when they were delivered to counsel here, who filed the bill in the following August.

It is manifest that, during all this time up to 1893, the complainant was, so far as Mrs. Owen is concerned, acquiescing in her notice of abandonment of the contract, and on his part holding back, as he had the right to do under her notice, from fulfillment on his part, and this *status* continued until the expiration of the three years provided for the term of the mortgage. The defendants had nothing to do with the delay of Mr. Dupignac, and although this failure of Mr. Dupignac to act may explain complainant's delay, it does not, so far as the defendants are concerned, excuse it. And it must also be noticed as of some importance, on the question of delay in filing bill after notification that the vendor refused to perform, that the contract in this case, as set out in the bill, is unilateral, and only became binding on Ketcham by the filing of the bill. *Carskaddon* v. *Kennedy, 13 Stew. Eq. 259, 277; Richards* v. *Green, 8 C. E. Gr. 536.* A delay of over three years in committing himself to any obligation to the defendant would therefore seem fatal to the right to require performance.

It is true that Mrs. Owen produced on the hearing a similar contract, signed in Ketcham's name, and which was delivered to her by Mr. Sire, but Ketcham did not give any evidence as to this signature or whether he had authorized it, so that the case still stands on complainant's bill as one to enforce a unilateral contract.

Complainant's counsel relies upon *Young* v. *Young, 6 Dick. Ch. Rep. 491,* where relief was granted, as analogous to this case on the question of laches. But the case was, as I look at it, altogether different, and the fact which here makes time essential, viz., the deliberate repudiation of an acknowledged written contract, was altogether absent there. In *Young* v. *Young* the complainants were in possession for years. There was no doubt as to the precise character of their remedy, and whether it was legal or equitable, action on complainants' part happened to be unavoidably delayed, and the complainants were always insisting on their rights. The case, therefore, does not seem to cover this.

I advise a decree dismissing the bill, upon this ground, without examining the other objections set up by defendants.